626 So.2d 979 (1993)
Roland BOUCHER and Monique Boucher, Appellants,
v.
FIRST COMMUNITY BANK OF ORANGE CITY, etc., et al., Appellees.
No. 92-3005.
District Court of Appeal of Florida, Fifth District.
October 15, 1993.
Rehearing Denied November 15, 1993.
*980 Richard S. Graham of Landis, Graham, French, Husfeld, Sherman & Ford, P.A., Daytona Beach, for appellants.
Harlan L. Paul of James, Zimmerman & Paul, DeLand, for appellee First Community Bank of Orange City.
David A. Monaco of Monaco, Smith, Hood, Perkins, Loucks & Stout, Daytona Beach, for appellees Earl Abbott and Abb-Hitt Corp.
PETERSON, Judge.
Roland and Monique Boucher appeal summary judgments entered in favor of First Community Bank of Orange City (First Community) and Abb-Hitt Corporation (Abb-Hitt).[1] We affirm the summary judgment in favor of First Community but vacate it as to Abb-Hitt.
This action began when First Community filed a complaint seeking a deficiency judgment under a security agreement after it repossessed and sold Boucher's mobile home. Boucher responded with a counterclaim and a third-party action against Abbott, Abb-Hitt and Pathfinder Services, Inc. (Pathfinder). The counterclaim requested cancellation of the promissory note and the security agreement, the subjects of First Community's complaint, and damages. The third party complaint against the other parties seems to have been for fraud, misrepresentation and "illegal actions."
Abb-Hitt owned Nature's Woods, a mobile home park in DeLand. Earl Abbott was a shareholder and officer of Abb-Hitt. Abb-Hitt gave Pathfinder the exclusive right to sell mobile homes in Nature's Woods. Pathfinder could do so only under Abb-Hitt's license to sell mobile homes since Pathfinder did not have a license. Pathfinder was also the manager of Nature's Woods. As part of the sales agreement between Abb-Hitt and Pathfinder, Abb-Hitt was to receive from Pathfinder a $7,500 admittance fee each time a mobile home was placed on a lot in the park. In addition Abb-Hitt would also receive monthly rent for each occupied site.
Pathfinder devised a plan whereby it would lease back mobile homes it sold to its customers and bear the responsibility for all expenses of its customer's ownership including the normal expenses connected with mobile home ownership such as maintenance, *981 insurance, utilities and lot rental, and including payments on a purchase money loan secured by the mobile home. Pathfinder's plan to obtain funds for paying such obligations was to rent the mobile homes to tourists. Since the rentals would be short term, the rental rates would be at a premium and would therefore exceed the expenses and provide owners with a net monthly return of about $100 until the loan was paid. Thereafter the mobile home owners would then enjoy a lien-free mobile home.
Roland Boucher first learned about an opportunity to purchase a mobile home from Andrew Bedard, an insurance agent in his home town in Connecticut whom the Bouchers had known for approximately eight years and who had sold them a life insurance policy. Boucher operated a service station there that provided a modest income. The deal presented to Boucher was to purchase with a $500 down payment a new, fully furnished mobile home through Pathfinder for approximately $50,000. In addition to earning $101 per month from rentals, Boucher would have no responsibilities for renting the mobile home nor any responsibilities for payment of expenses. Further, and most importantly, payments on debts incurred to acquire the mobile home would be covered by Pathfinder. Additionally, Boucher would have the use of the mobile home at least two times per year and own the home debt-free after ten years.
Bedard, who was one of several agents of Pathfinder in the northeast receiving commissions upon a sale of a mobile home, invited Boucher to fly to Florida in order to inspect the project and to meet with officers of Pathfinder to further discuss this opportunity. Boucher, and a few of his friends that Bedard had also invited, made the trip. They stayed overnight in one of the mobile homes that had been placed in Nature's Woods and discussed the opportunity with George Curran and Bob Cooper, officers of Pathfinder. Boucher resisted sales efforts to make the down payment of $500 on that trip and returned to Connecticut.
It took almost two months for Boucher to make the purchase. He was influenced by the fact that 45 to 50 people he knew had taken advantage of the opportunity earlier in 1988 and had enjoyed success with the plan. In July or August of that year Boucher applied for a loan from First Community. Bedard had given Boucher the loan application form and later advised Boucher that it had been rejected. According to Boucher, Bedard suggested that Boucher reapply and misrepresent his income. With the new application Boucher supplied a photocopy of three checks payable to him from his service station. The checks were in the amount of $900 each bearing dates of three successive weeks. The purpose was to incorrectly show to First Community that he earned $900 per week. Boucher testified that he initially resisted the suggestion, indicating that it was wrong and that he would get caught, but he finally succumbed. Later, Bedard informed him of the loan approval and presented him with an agreement to purchase a mobile home for $52,900 which the Bouchers then signed.[2]
In late October of 1988 Bedard visited Boucher at his home, bringing the closing documents that had been forwarded to Bedard by Pathfinder. Included were First Community's loan closing documents indicating a loan of $47,610. This was consistent with the "Plain Language Purchase Agreement" that showed $47,610 to be the balance due after a charge for sales tax and a down payment of $8,464. Presumably it was at this meeting that Boucher wrote a check for $8,464 payable to Pathfinder,[3] a copy of which would be presented to First Community as evidence of the down payment having been made. That check, along with the three $900 checks to obtain approval of the loan, were never presented to or paid by the drawee bank. Instead, Boucher testified that he paid only $500 by check to Pathfinder for the down payment. In his deposition Boucher *982 gave vague answers about his understanding of what the loan documents obligated him and his wife to pay. He stated that he did not read the loan documents but was told that "[i]f anything happened with this, they cannot touch our credit up there, they told us all kind of stuff." He also noted that he and his wife had no contact with the bank or its employees until much later when the loan was in default.
Boucher suspected no problems with the purchase until February 15, 1990 when First Community advised him that the January 28, 1990 payment of $593.19 was in default. This was the first of three notices he ultimately received from the bank. Boucher responded each time by calling Pathfinder only to be assured by Fran  "the lady that was taking care of the paperwork"  not to worry about it, that it was all under control. Boucher decided to visit Nature's Woods after the third call from the bank. At Nature's Woods he was assured that everything was under control. Although he discovered that there was no mobile home on his assigned lot, Boucher made two of the loan payments based on Pathfinder's explanation that rentals were slow and its promise that he would be repaid. Boucher was never repaid for the two loan payments. A mobile home was eventually installed on the assigned lot but without the promised air conditioning equipment and furniture, and Pathfinder used it for storage. Neither Pathfinder nor Boucher made any further payments and First Community brought its action for a deficiency judgment.

CLAIM AGAINST ABB-HITT
The allegations by the Bouchers' third party complaint against Abb-Hitt, Abbott and Pathfinders complained in paragraph seven that various acts of fraud, misrepresentation and violation of applicable law set forth in other paragraphs induced them to purchase the mobile home and incur liability to First Community. Abb-Hitt's motion for summary judgment was based upon the sole ground that, because Abb-Hitt's officers never communicated with Boucher before the sale had been completed, Abb-Hitt could not be responsible for the alleged wrongdoings. While it may be true that those officers of Abb-Hitt had no personal contact with Boucher, the motion for summary judgment ignores Curran's statements that Pathfinder was Abb-Hitt's agent for mobile home sales, that it was the park manager of the mobile home park, that Pathfinder sold the mobile homes under Abb-Hitt's license, and that Abb-Hitt received a $7,500 admittance fee and monthly rent for the placement of the mobile homes in its park. While Abb-Hitt attempted to distance itself from Boucher and Pathfinder in its motion for summary judgment by showing that its officers had no contact with Boucher and engaged in no wrongdoings, it totally failed to address the issue of whether its agent, Pathfinder, was guilty of Boucher's alleged wrongdoings and if so, whether those wrongdoings would be attributed to its principal, Abb-Hitt.
Although the third party complaint in this case could have been better drafted, it would have been error for the trial court to enter summary judgment on the ground that the complaint failed to state a cause of action. In making a ruling on a motion for summary judgment, the trial court is limited to the grounds raised in the motion. Trawick, Florida Practice and Procedure, § 25-6, p. 380, citing 1.100(a), 1.510(c), Fla.R.Civ.P.; Spinner By and Through Spinner v. Wainer, 430 So.2d 595 (Fla. 4th DCA 1983). Lack of clarity of a complaint is not a basis for summary judgment where the facts before the trial court are not sufficiently settled and crystallized so that it can be said that plaintiff does not have a cause of action. Smith v. Reeder, 371 So.2d 718 (Fla. 3d DCA 1979); accord, Nazareth v. Herndon Ambulance Service, Inc., 467 So.2d 1076, 1077, n. 2 (Fla. 5th DCA), rev. denied, 478 So.2d 53 (Fla. 1985). We believe that there remain outstanding the issues of whether Pathfinder committed wrongful acts and, if so, whether Abb-Hitt should be held responsible because of its relationship to Pathfinder.
We therefore vacate the trial court's summary judgment in favor of Abb-Hitt and remand for further proceedings.

CLAIM AGAINST FIRST COMMUNITY
The Bouchers' counterclaim against First Community alleges that the bank knew or should have known of the fraud, misrepresentations *983 and illegal actions of Pathfinder and the other third party defendants, and that the bank had a duty to refrain from closing the loan and disbursing the proceeds. The Bouchers contend that First Community was in a better position to detect the fraud and inquire as to the status of the project and completion of the mobile home because they lived in a distant state and were not present when representations and disbursement were made. They claim that they lost their "down payments" and have been further damaged by the cost of defending against First Community's action and by the loss of their reputations and credit ratings.
All of these allegations are without merit when examined in light of the allegations made against the third party defendants and the deception perpetrated by the Bouchers against First Community. Count I of the complaint alleges that the third party defendants engaged in a conspiracy to fraudulently entice First Community to make the loan. There is no allegation that First Community was a party to the conspiracy or that Boucher contracted with it to investigate the project, Pathfinder's plan, or the stage of completion of the unit.
The Bouchers provide authority for the proposition that a bank can be held liable when it did not act in good faith and in accordance with reasonable commercial standards and that these are usually factual issues to be determined by the trier of fact, Forys v. McLaughlin, 436 So.2d 280 (Fla. 5th DCA 1983); Travelers Ins. Co. v. Jefferson Nat. Bank at Kendall, 404 So.2d 1131 (Fla. 3d DCA 1981); Barnett Bank of Miami Beach, N.A. v. Lipp, 364 So.2d 28 (Fla. 3d DCA 1978). The cited cases are inapplicable to the instant case because they all construe section 673.419(3), Florida Statutes, dealing with conversion of negotiable instruments. The Bouchers candidly admit that they have not found precedent holding that a bank such as First Community should have protected their interests because they were not Florida residents. Although it may have been poor business practice for First Community to have closed the loan without first inspecting the collateral, it had no obligation to do so on the Bouchers' behalf. Further, in dealing with the Bouchers, the lender had the right to rely on the borrowers' representations regarding their income and the amount of their down payment on the mobile home. We therefore affirm the summary judgment in favor of First Community.
Summary judgment AFFIRMED in part; VACATED in part; REMANDED.
THOMPSON, J., concurs.
GRIFFIN, J., concurs with opinion.
GRIFFIN, Judge, concurring.
I concur in the result reached by the majority but only because of the extremely narrow ground for summary judgment contained in Abb-Hitt's motion.
NOTES
[1] The Bouchers do not appeal the summary judgment entered in favor of Earl Abbott individually.
[2] The upper left-hand corner of the purchase agreement reflects the language: "A PLAIN LANGUAGE PURCHASE AGREEMENT UCC § 2-201". The copy in the record does not reflect the name of a seller.
[3] During his deposition Mr. Boucher described the preparation of this $8,464 check as writing a "fake" check.