943 So.2d 869 (2006)
CHRISTIAN RELIEF SERVICES INC., Appellant,
v.
William H. WALTON, Jr., Appellee.
No. 1D06-0008.
District Court of Appeal of Florida, First District.
November 17, 2006.
Rehearing Denied December 21, 2006.
Kenneth B. Wright of Bledsoe, Jacobson, Schmidt & Wright, Jacksonville, and Charles H. Carpenter of Pepper Hamilton LLP, Washington, D.C., for Appellant.
Frederick R. Brock of Gartner, Brock and Simon, Jacksonville, for Appellee.
PER CURIAM.
This is an appeal from a contractual dispute in which the trial court granted final summary judgment in favor of appellee, declared that appellant has no rights in or under the contract, and concluded that the contract is void and of no effect. After de novo review of the matter, we agree with the trial court and affirm.
AFFIRMED.
ALLEN and DAVIS, JJ., concur.
POLSTON, J., dissents with opinion.
POLSTON, J., dissenting.
This appeal arises from a $20,878,000 contract for the purchase of nine apartment buildings in Duval, Putnam, and Polk counties by appellant Christian Relief Services Charities, Inc. ("CRSC"). Appellee William H. Walton, Jr., as the general partner to various single-asset limited partnerships, agreed to sell the properties to CRSC. When the deal fell apart, Walton sued to have the contract declared void on various grounds, and CRSC counterclaimed for breach of contract and specific performance. I respectfully dissent because the trial court erred by entering final summary judgment in favor of Walton.

I. BACKGROUND

Facts
The contract allowed CRSC to make a due diligence review of the properties, and provided for a specific closing date. CRSC was required to make two escrow deposits: $50,000 due two days after execution of the contract, and $25,000 by the end of the inspection period. Walton, for his part, was required to provide certain information within that specific period, so that CRSC could conduct its due diligence review within the time provided.
The contract includes a number of descriptive schedules and exhibits. Most of these schedules and exhibits were filled in, but some were left blank when the contract was executed by the parties. Paragraph 8 of the contract required various exhibits, documentation, and items to be provided at closing or as otherwise specified, including:
p) Other Documents. The parties shall deliver to each other such other documents as may be reasonably required to effectuate the conveyance of the Projects contemplated hereunder.
(Emphasis added).
The contract also requires specific notices of default and opportunity to cure before the parties may terminate the contract:
14. Default

*870 a) Purchaser's Default. In the event that Purchaser defaults in its obligations hereunder, Purchaser shall have ten (10) days after receiving such notice to cure such default. If Purchaser fails to cure the default within that period, then Seller shall have the option to either: (i) elect to extend the Closing date and/or the cure period to accommodate Purchaser's diligent efforts to remedy the unsatisfied condition or obligation, or (ii) terminate this Agreement. If Seller elects to terminate this Agreement, Seller shall give written notice of its election to Purchaser and the Seller shall give written notice to the Purchaser that the Deposit must be delivered to the Seller; and upon the Seller's receipt of the Deposit, this Agreement shall terminate and the parties shall have no further obligations to one another.
. . .
b) Seller's Default. In the event that Seller defaults in its obligations hereunder, Seller shall have ten (10) days after receiving such notice to cure such default. If Seller fails to cure the default within that period, then Purchaser shall have the option to either: (i) elect to extend the Closing Date and/or the cure period to accommodate Seller's diligent efforts to remedy the unsatisfied condition or obligation, or (ii) terminate this Agreement. If Purchaser elects to terminate this Agreement, Purchaser shall give written notice of its election to Seller and the Purchaser shall give written notice to the Seller that the Deposit must be delivered to the Purchaser, Seller shall pay to purchaser an amount equal to Purchaser's costs incurred in connection with the transaction contemplated by this Agreement, including reasonable attorneys fees (the "Termination Amount"), and upon Purchaser's receipt of the Deposit and the Termination Amount this Agreement shall terminate and the parties shall have no further obligations to one another. Purchaser and Seller agree that payment of the Deposit and the Termination Amount to Purchaser under this Paragraph 14.b) shall be as liquidated damages and not as a penalty, it being agreed that a precise measure of damages would be difficult to ascertain.
CRSC asserts that because Walton did not timely meet all his obligations with respect to the due diligence review, CRSC requested, by its November 3, 2003 letter, an extension of the time to conduct its due diligence review. Walton granted this extension. CRSC requested a second extension of the time for due diligence review on December 23, 2003:
We are writing to indicate the need for another extension of the inspection period provided for in Section 4A of the above referenced Agreement.
Section 4A of the Agreement provides that during the inspection period, Purchaser would have an opportunity to review the various due diligence materials. This included obtaining Preliminary Title Reports. As you are aware, it also provides that prior to the end of the underwriting period we would provide you with notice of any objections to title. We are working with Michael Hughes at your suggestion. We also have agreed, as you and Scott discussed, not to move forward rapidly with new surveys because of the expense. Therefore, we are unable to review the preliminary title reports and advise of any objectionable title conditions.
We continue moving ahead rapidly, undertaking many of the tasks that we would achieve during the underwriting period. However, it is important that the amended inspection period which would end on December 24 be extended. *871 By means of this letter, we are requesting an extension of the same until January 31, 2004. This should enable us to obtain the surveys at a pace you are happy with and to agree on a financing approach. If an extension is not acceptable, we would have no course but to terminate the contract at this point in time, an action, of course, which we do not wish to take.
If the foregoing extension is acceptable to you, then, to limit our exposure, this letter will constitute an amendment to the Agreement providing for an extension of the Inspection Period until January 31, 2004. If this Amendment is acceptable, please indicate by executing on this letter as indicated below. Thank you very much.
Please call me with any questions.
With all good wishes for the holiday season to you and your wonderful family and staff.
Walton did not execute this letter for the extension of time. CRSC made the second escrow deposit on January 17, 2004, less than a month late. In a January 25, 2004 letter to CRSC, Walton stated that he considered the agreement "null and void by the failure of [CRSC] to not fulfill the terms of the agreement:"
I received by e-mail the letter of intent by GMAC. I have reviewed their letter with great care and find it unacceptable to proceed. There are too many escape clauses on Washington Heights, which I feel cannot be satisfied. If they could be satisfied, it would not be in an early time frame.
There is also the unknown of what construction might be required and escrowed at 150% of costs. If the[ir] survey was anything like Juanita's original estimates, I would have to pay them to close.
It is also obvious that Doug Westfall has no enthusiasm for the loan and would be extremely difficult to negotiate things that might be necessary.
This acquisition started with all the properties and has gotten reduced down to the better properties without consideration to my original needs.
The agreement is now in violation, as your letter of December 23, 2003 stated, without the extension that was requested and not granted.
Consequently, consider this agreement null and void by the failure of your client to not fulfill the terms of the agreement.
Shel, this is very difficult for me to come to this conclusion, but after the time trying to get it closed, I feel it is mandatory for me to do something else.
I hope you get along well with your operation. I still value you as one of my friends.
CRSC contends that Walton acted inconsistently with this contention because he continued to go forward with the transaction. CRSC responded to both letters on January 30, 2004: "We are moving ahead at full steam, expending considerable sums of money. . . . [W]e fully anticipate being able to meet, if not beat, the May 24th closing date. . . ." CRSC contends that as Walton was obligated to do under section 5(h) of the contract, he obtained tenant endorsements of the purchase in late February and early March 2004 and, on March 4, 2004, Walton's office provided them to counsel for CRSC.
CRSC argues that Walton repudiated the contract altogether by letter of his counsel dated March 9, 2004:
This office represents W.H. Walton, Jr., as the General Partner of the owners of the properties described on Schedule "A" to the referenced agreement. *872 By letter dated January 25, 2004 (copy enclosed), Mr. Walton advised Sheldon L. Schreiberg that the Purchaser was in violation of the terms of the referenced agreement because, as stated in Mr. Schreiberg's letter of December 23, 2003, the extension requested by the Purchaser was not granted. Thus, the second deposit was not timely made. Accordingly, Mr. Walton advised Mr. Schreiberg to ". . . consider this agreement null and void by the failure of your client to (sic) not fulfill the terms of the agreement."
Mr. Schreiberg's response of January 30, 2004 attempted to assuage Mr. Walton's concerns. However, despite the content of Mr. Schreiberg's letter, it is obvious that the Purchaser will not be able to meet the May 24 closing date provided in the contract. Despite the best efforts of Mr. Walton's closing attorney, J. Michael Hughes, First American Title Insurance Company did not advise Mr. Walton that the additional $25,000.00 deposit was not received by First American Title until January 20, 2004 until February 24, 2004[sic].
In light of the foregoing, our client considers the contract terminated due to the Purchaser's failure to timely perform. By copy of this letter to the escrow agent, we are advising said agent that the deposit may be returned to the Purchaser.
In light of the foregoing, you are further notified that each party will be responsible for any costs incurred by such party and none other.

Summary Judgment
Walton then filed suit in the circuit court, seeking a declaration that the contract was void as a matter of law. CRSC counterclaimed for breach of contract and specific performance.
The parties each moved for summary judgment on the opposing party's claim. Walton's motion asserted that the contract limits CRSC's options if Walton defaulted to either (i) extend the closing date, or (ii) terminate the agreement, and because CRSC did not provide the requisite notice of termination, the agreement has not been terminated. Moreover, specific performance is precluded by the limitations in paragraph 14.b) of the contract. Walton requested the trial court to enter summary judgment in its favor as to CRSC's second amended counterclaim. No summary judgment evidence pursuant to Fla. R. Civ. P. 1.510(c) was filed by Walton in support of his motion.
CRSC's motion for summary judgment argued that specified alleged defects of the contract were insufficient, as a matter of Florida law, to render the contract void. Walton's pleadings alleged these defects, (i) the legal descriptions of the properties to be sold to be included in Exhibit A was blank (¶ 8 of the complaint), (ii) the identities of the selling entities are not listed anywhere in the agreement (¶ 7 of the complaint), and (iii) that most of the schedules and exhibits are blank and incomplete (¶ 6 of the complaint), caused the contract to be ambiguous and vague so that it is void ab initio. In support of its motion for summary judgment, CRSC filed excerpted copies of Walton's answers to its first set of interrogatories without the signature page, and an affidavit of one of its lawyers attaching copies of tenant endorsements that Walton forwarded to him.
In response, Walton filed his own May 13, 2005 affidavit disputing that he sent any tenant endorsements to CRSC's lawyer, and noting that the tenant endorsements filed with the court described the purchasing entities of each property as affiliates of Christian Relief Charities, Inc., none of which are parties to the contract *873 between Walton and CRSC. Walton stated in his affidavit that "he knows that after it became apparent that a definitive purchase agreement (without blank exhibits and schedules) could not be effected between the parties, he advised [CRSC] that it should request the return of the deposit it had made with its lender, GMAC," and that "in response to his notice that the purchase agreement attached to the Complaint was of no further force and effect [CRSC] did, in fact, request and receive the return of the deposit it had made with its lender, GMAC." Walton also filed a subsequent affidavit dated May 19, 2005, stating that CRSC's lawyer advised him that his firm's work for CRSC was pro bono unless the transaction closed, at which time his firm would be paid.
Without explanation, the circuit court granted Walton's motion and denied CRSC's motion. CRSC filed a motion to clarify the ruling  to find out whether the circuit court had granted Walton's motion because it believed the counterclaim premature or because it believed the contract void. The circuit court denied CRSC's motion for clarification without explanation.
Walton moved for summary final judgment on the basis of the trial court's order granting its motion for summary judgment and denying CRSC's motion for summary judgment. No additional summary judgment evidence pursuant to Florida Rule of Civil Procedure 1.510(c) was filed by either of the parties. The trial court entered summary final judgment, declaring that:
1. [Walton]'s Motion for Summary Final Judgment is hereby granted, and [Walton] shall go hence without delay;
2. [CRSC] has no rights or interest in and under the Property Purchase and Sale Agreement as described in the Complaint for Declaratory Judgment filed herein; and
3. Said Property Purchase and Sale Agreement is void and of no effect.

II. ANALYSIS

Standard of Review
"The movant for summary judgment bears the initial burden of demonstrating by competent evidence the nonexistence of any question of material fact, and only when the movant has satisfied this burden does the burden shift to the opposing party to come forward with evidence to the contrary. Moreover, movant's proof of the nonexistence of a genuine issue of fact must be conclusive, such that all reasonable inferences which may be drawn in favor of the opposing party are overcome." Spradley v. Stick, 622 So.2d 610, 612 (Fla. 1st DCA 1993).
"Summary judgments present a classic example of the type of decisions that are subject to the de novo standard of review, except that the review of a summary judgment requires a two-step analysis. First the appellate court must determine whether the trial court properly resolved the matter by a summary judgment. If so, the appellate court must then decide whether the trial court was correct on the merits of the decision." Philip J. Padovano, Florida Appellate Practice § 9.4, at 163 (2006 ed.).

Summary Judgment Rulings on Facial Validity of Contract
Because there was no summary judgment evidence in the record to support the trial court's ruling that the contract is invalid, it must have reached that conclusion from a facial review of the contract. Accordingly, we must decide whether the trial court was correct on the merits, by conducting a de novo review of Walton's three legal arguments addressed by CRSC in its motion for summary judgment: (i) the legal descriptions of the properties to *874 be sold to be included in Exhibit A was blank (¶ 8 of the complaint), (ii) the identities of the selling entities are not listed anywhere in the agreement (¶ 7 of the complaint), and (iii) that most of the schedules and exhibits are blank and incomplete (¶ 6 of the complaint). We do not reach all of the various reasons Walton raised in his complaint for asserting the contract is void because "[i]n making a ruling on a motion for summary judgment, the trial court is limited to the grounds raised in the motion." Boucher v. First Cmty. Bank of Orange City, 626 So.2d 979, 982 (Fla. 5th DCA 1993); see also Instituto Patriotico Y Docente San Carlos, Inc. v. Cuban Am. Nat'l Found., 667 So.2d 490, 492 (Fla. 3d DCA 1996) (holding that in ruling on cross motions for summary judgment, the trial court was "completely without jurisdiction to sua sponte make extraneous findings and conclusions on matters not raised by the parties").
Walton, the general partner on behalf of the selling limited partnerships, was in the best position to know the legal descriptions of the properties to be sold. The seller should not be able to invalidate the contract because of his own failure to include the legal descriptions known to him. The properties were identified by common name and address in Schedule A as shown below:

 Schedule A
 PROPERTY'S COMMON NAME AND ADDRESS
 Beachwood 2901 Beachwood Boulevard
 Jacksonville, FL 32233
 Bonny 1104 Bartow Road
 Lakeland, FL 33801
 Eureka Gardens I 1214 LaBelle Street
 Jacksonville, FL 32205
 Eureka Gardens II 1214 LaBelle Street
 Jacksonville, FL 32205
 Mellon Manor 3701 St. Johns Avenue
 Palatka, FL 33177
 Moncrief Village 1650 Moncrief Villages
 Jacksonville, FL 32209
 Southside 2301 Westmont Street
 Jacksonville, FL 32207
 University Plaza 710 Venus Mars Court
 Jacksonville, FL 32209
 Washington Heights 4229 Moncrief Road West
 Jacksonville, FL 32209

There is no basis in the law for the seller to reject the validity of the contract for its failure to provide legal descriptions in this contract at the time it was signed.
Walton is described in the contract as the general partner of the various limited partnerships that own the individual properties, collectively referred to as the seller. See RNR Invs. Ltd. P'ship v. Peoples First Cmty. Bank, 812 So.2d 561 (Fla. 1st DCA 2002) (providing that a general partner has apparent authority to bind a limited partnership in the ordinary course of partnership business or in the business carried on by the partnership unless the third party knew or received a notification that the partner lacked authority). These selling entities are known to Walton, and would be included in the recent title insurance policies of the projects, along with the legal description and identification of mortgages, that Walton is required by Exhibit B of the contract to provide to CRSC. See The Florida Bar, Florida Real Property Title Examination and Insurance §§ 4.57, 4.51 (5th ed.2006). The limited partnerships are identified by CRSC in its third amended counterclaim.
Other schedules and exhibits of the contract were left blank at the time of signing the contract. These schedules and exhibits included identification of existing mortgages, regulatory agreements, litigation, and environmental issues. This information should be known to the seller. Moreover, the contract explicitly provides that the parties should provide any documents required to close the transaction. None of these blank schedules and exhibits were essential terms of the contract. "Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them." Blackhawk Heating & Plumbing Co., Inc. v. Data *875 Lease Fin. Corp., 302 So.2d 404, 408 (Fla. 1974) (stating that "[t]he courts should be extremely hesitant in holding a contract void for indefiniteness").
Walton has failed to identify any missing exhibits and schedules, containing essential terms, that cause the contract to be void. The parties moved forward in their due diligence without any apparent difficulty caused by missing exhibits and schedules. Walton's letters to CRSC do not cite any problems with missing exhibits and schedules, but instead point to the second deposit not being timely made. The timeliness of the second deposit was not a subject of the cross motions for summary judgment and therefore not considered by the trial court. Therefore, the trial court erred as a matter of law in reaching its conclusion that the contract is void on its face.

CRSC's Counterclaim
Walton's first motion for summary judgment related to the relief available to CRSC on its counterclaim. Because the contract is not void, the trial court's ruling on final summary judgment that CRSC has no interest in the contract should be reversed. The trial court's ruling in favor of Walton that CRSC is not entitled to specific performance is not at issue because in its third amended complaint, CRSC dropped its count for specific performance.
CRSC argues that the trial court erred when it granted Walton's first motion for summary judgment, asserting that it is entitled to damages rather than the more limited relief provided in the contract because Walton repudiated the contract. CRSC states that under Florida law, "[w]henever, while the contract is still executory, one of the parties directs the other party not to proceed with the performance of the contract, the former has breached the contract and the latter may bring an action for damages." S. Crane Rentals, Inc. v. City of Gainesville, 429 So.2d 771, 773 (Fla. 1st DCA 1983) (citing Poinsettia Dairy Prods., Inc. v. Wessel Co., 123, Fla. 120, 166 So. 306 (1936)). Moreover, CRSC argues that "[w]hen faced with the repudiation of an executory contract, the non-breaching party's duty to tender performance is excused." Camel Invs., Inc. v. Webber, 468 So.2d 340, 342 (Fla. 1st DCA 1985) (citing Hosp. Mortgage Group v. First Prudential Dev. Corp., 411 So.2d 181 (Fla.1982)).
Walton failed to conclusively prove the nonexistence of a genuine issue of fact, with all reasonable inferences drawn in favor of CRSC, of whether he repudiated the contract and how the parties proceeded in performing the contract. Accordingly, I would remand for further proceedings on Walton's counterclaim.

Conclusion
The trial court erred by ruling that the contract is facially void because (i) the legal descriptions of the properties to be sold to be included in Exhibit A was blank, (ii) the identities of the selling entities are not listed anywhere in the agreement, and (iii) most of the schedules and exhibits are blank and incomplete. There are disputed issues of fact regarding CRSC's counterclaim. Therefore, I would reverse the trial court's final summary judgment and remand for further proceedings on the remaining issues of Walton's complaint and CRSC's third amended counterclaim.
I respectfully dissent.